IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Paul Daval,<br><br>         Plaintiff,<br><br>    v.<br><br>Dr. Merrill Zahtz, John Varga, Wexford Health Sources Inc., Cathy Smith, Kay Hood, and Amber Allen,<br><br>         Defendants. | Case No. 3:19-cv-50147<br><br>Honorable Iain D. Johnston |

## MEMORANDUM OPINION AND ORDER

Plaintiff Paul Daval ("Daval"), an inmate at Dixon Correctional Center (DCC), brings this suit under 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment right to be free of cruel and unusual punishment. Dkt. 57. He sues employees of the Illinois Department of Corrections (IDOC)—Warden John Varga and Amber Allen ("IDOC Defendants"). He also sues Wexford Health Sources and its staff—Wexford, Dr. Merrill Zahtz, Cathy Smith, and Kay Hood ("Wexford Defendants"). His claims center around continuous delays in his medical treatment, specifically with the scheduling of necessary visits to eye specialists to treat his sarcoidosis. The Court allowed limited discovery only on the question of whether Daval exhausted his administrative remedies. After that concluded, both the IDOC and the Wexford Defendants filed motions for summary judgment on the question of exhaustion. Dkts. 70, 74. Defendant John Varga ("Warden Varga") has also filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state

1

a claim based on the theory that Daval has failed to allege Warden Varga's personal involvement in the purported constitutional violation. Dkt. 74. For the reasons explained below, the motions for summary judgment [70,77] are denied, but the motion to dismiss Warden Varga [74] is granted, without prejudice to file an amended complaint.

## I. Background

Plaintiff Paul Daval began his incarceration at DCC on July 18, 2017.[1] Dkt. 82, ¶ 1. He suffers from sarcoidosis, an inflammatory disease that causes pressure in his left eye, severe pain, light sensitivity, headaches, blurry vision, and—if not treated properly—his condition can lead to permanent vision loss. Dkt. 90, ¶ 1. Before arriving at DCC, Daval managed his condition with steroid eye drops, which he continued to use while housed at the Cook County Jail and at Stateville Correctional Center before arriving at DCC. Dkt. 57, ¶¶ 16–17. Daval alleges, however, that he quickly ran out of those drops after arriving at DCC, repeatedly went to sick call to request more eye drops, but received no medication between July 30, 2017, and October 18, 2017. *Id.* ¶ 18. On November 2, 2017, Dr. David Ludford (prison optometrist) examined Daval, noted that Daval had elevated eye pressure, and recommended an urgent referral to an ophthalmologist. Dkt. 90, ¶ 3.

Notwithstanding that referral, and Dr. Ludford's subsequent examinations of Daval that continued to result in the same recommendation, Daval was not

---

[1] The facts are taken from the parties' Local Rule 56.1 fact statements as well as Daval's complaint. For the purpose of the motions for summary judgment, only the undisputed facts in the LR 56.1 statements have been considered. The allegations in Daval's complaint, however, are pertinent to Warden Varga's motion to dismiss.

urgently scheduled to see an ophthalmologist. *Id.* ¶ 4. On January 22, 2018, having still not been scheduled to see the specialist and continuing to experience worsening symptoms, Daval filed a grievance complaining that he needed to see the specialist urgently. *Id.* ¶ 5; Dkt. 82-3, Ex. B., at 14. In that grievance, Daval explained that Dr. Ludford referred him for an "urgent" examination with a specialist, and in the two and a half months since then, that urgent examination had not occurred. Dkt. 82-3, at 14. Under relief requested, Daval noted that he needed to see the eye specialist and, if he was not afforded that examination, he could lose his vision in his left eye. *Id.* On March 23, 2018, the assigned grievance counselor noted that "the inmate has been seen multiple times for this issue and is being treated." *Id.*

On May 11, 2018, the grievance officer further explained that Daval had been sent to the specialist at Hauser-Ross Eye Institute (HREI) on March 1, March 9, and April 5, 2018, and had another appointment scheduled. *Id.* at 15. Under recommendation, the grievance officer noted that the grievance had been reasonably satisfied and that Daval had access to healthcare, so no further action was recommended. On May 14, 2018, Warden Varga concurred. *Id.* The Administrative Review Board (ARB) then responded to Daval and noted that the grievance was "MOOT-Offender has been seen numerous times." *Id.* at 16.

Daval was seen by the ophthalmologist at HREI six times between March 1, 2018, and September 21, 2018. Dkt. 90, ¶ 9. At the September 21, 2018 examination, the ophthalmologist requested a follow-up visit in two to four weeks. *Id.* ¶ 10. Shortly after that time had expired, on October 30, 2018, Daval was

examined by the new prison optometrist, Dr. Popovich. He also explained that Daval needed to return to HREI for a follow-up evaluation. *Id.* ¶ 11. That evaluation did not occur until January 11, 2019, and by that time Daval's eye pressure had become "very elevated." *Id.* ¶ 12. Based on that examination, the ophthalmologist requested that Daval return within one to three days for a follow-up.[2] *Id.* ¶ 13; Dkt. 82-4, Ex. C, at 41. Over the next three weeks, Daval was sent to the prison optometrist four times, but he was not sent back to the ophthalmologist as requested. Dkt. 90, ¶ 14. In those visits, the prison optometrist reiterated that Daval should be sent to the specialist as soon as possible, urgently. At the January 29 visit, the optometrist noted that Daval had not been sent to the ophthalmologist despite numerous referrals and that he needed to be seen urgently. He then circled the word "urgently." Dkt. 82-4, Ex. C, at 21.

Daval was then examined by the HREI ophthalmologist on February 1, 2019, and again on February 5, 2019. Dkt. 90, ¶ 16. At the February 5, 2019 visit, the ophthalmologist recommended that Daval have eye surgery within the week because of the elevated pressure. *Id.* Two days later, the prison optometrist then reiterated the need for urgent surgery. *Id.* ¶ 17. On February 12, 2019, Daval filed an emergency grievance requesting the surgery, which had not happened within the week as recommended. Dkt. 82-3, Ex. B, at 17. Under relief requested, Daval explained that he needed to be sent out for the surgery as soon as possible or risk

---

[2] Defendants' response to this statement contended that that doctor requested Daval return in one to three weeks instead of days. But the cited exhibit (the medical records) says days and not weeks.

losing vision in the eye. *Id.* On February 15, 2019, Warden Varga denied the emergency request and checked the box indicating that Daval had not substantiated the need for emergency action. *Id.* Although Daval did not refile the grievance as non-emergency, he was sent to a doctor at the University of Illinois Chicago (UIC) the same day Warden Varga denied the grievance; that doctor then recommended urgent eye surgery to prevent irreversible vision loss. Dkt. 90, ¶ 24. Even though that surgery then occurred on February 18, 2019, Daval claims that he still suffered permanent vision loss in his left eye. *Id.*

After the surgery, Daval's problems continued. At a February 26, 2019 post-surgery examination, Daval contends that he was told to return for another follow-up within three weeks. Dkt. 90, ¶ 25. Defendants dispute this point, but a review of the supporting material does seem to support Daval's contention, though the handwritten notes are very difficult to read. Dkt. 82-4, Ex. C, at 31. Nevertheless, he was not sent for a follow-up examination until May 16, 2019. Dkt. 90, ¶ 26.

On April 3, 2019, Daval submitted another grievance. Dkt. 82-3, Ex. B, at 18. In that grievance, he requested to be seen by the eye doctor to determine why his eye issues persisted after the surgery. *Id.* On April 19, 2019, the grievance counselor received the grievance. But no response was offered until July 26, 2019 (more than three months later), when she wrote a response that noted that the request was approved, that he had surgery on February 18, that he had returned for follow-up examinations on February 19 and 26, and that he was supposed to return three weeks after that. The counselor's notes then indicated that UIC had cancelled the

third appointment but never rescheduled and that she had called that day to schedule the visit. *Id.* By that time, Daval had already filed this suit. Dkt. 1 (suit filed on July 2, 2019).

On April 14, 2019, Daval filed another grievance. Dkt. 82-3, Ex. B, at 23. That grievance more generally complained of the repeated delays and that he was not timely receiving the treatment recommended by his specialists. Under relief requested, he explained that he wanted the eye doctor and responsible medical staff at DCC suspended. For reasons unknown to the Court, that grievance was not received by the grievance counselor until May 5, 2019, and though the handwritten date is not clear, the counselor's response appears to have been entered in October 2019, well after the date this suit was filed. *Id.*

The Defendants have now moved for summary judgment, arguing that they are entitled to judgment as a matter of law, contending that Daval did not exhaust his administrative remedies before filing suit. Dkts. 70, 77. Warden John Varga also moved to dismiss on the theory that Daval has not alleged any personal involvement by the Warden in any purported constitutional violation. Dkt. 74.

## II.    Motion for Summary Judgment

All Defendants move for summary judgment because, as they see it, Daval failed to exhaust his administrative remedies before filing suit. Because failure to exhaust administrative remedies is an affirmative defense, the Defendants bear the burden of proof. *Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016). The Defendants meet that burden only if they show that no dispute of material fact

exists and that they are entitled to judgment as a matter of law.[3]    Fed. R. Civ.

P. 56(a). Furthermore, the Court construes the facts and inferences in the light

most favorable to the nonmoving party. *Hernandez v. Dart*, 814 F.3d 836, 840 (7th

Cir. 2016). If the movant bears the burden of proof at trial, it must make a showing

sufficient for the court to hold that no reasonable trier of fact could find other than

for the moving party and must establish all elements of the claim or defense to

warrant judgment as a matter of law. *Calderone v. United States*, 799 F.2d 254, 259

(6th Cir. 1986). In that circumstance, the movant must come forward with evidence

on each element that would require judgment as a matter of law if uncontroverted

at trial. *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992).

The Prison Litigation Reform Act (PLRA) requires exhaustion of

administrative remedies: "No action shall be brought with respect to prison

conditions . . . by a prisoner confined in any jail, prison, or other correctional facility

until such administrative remedies as are available are exhausted." 42 U.S.C. §

1997e(a). Thus, because Daval is housed in an Illinois Department of Corrections

facility, he must abide by the grievance process established by Illinois law. That

---

[3] If disputes of material fact existed regarding an inmate's exhaustion of administrative remedies, the Court would hold an evidentiary hearing. *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008). This Court's practice is to require *Pavey* hearings, either before the magistrate judges on consent or before it if the parties are so unreasonable that they cannot consent. As the Seventh Circuit made clear in 2015, the exhaustion issue is not well suited to summary judgment motions. *Wagoner v. Lemmon*, 778 F.3d 586 (7th Cir. 2015). Why waste time with summary judgment motions? An evidentiary hearing will provide a definite resolution and take less time and resources of all involved. Defense counsel should think long and hard about filing summary judgment motions on this affirmative defense. They should remember that their clients have the burden of not only showing that there are no genuine issues of material fact but also the burden of showing that in light of all the evidence (which cannot be contradicted with other evidence), they are entitled to judgment as a matter of law.

process was codified in 20 Ill. Admin. Code §§ 504.800 *et seq.*[4] *Thornton v. Snyder*, 428 F.3d 690, 694 (7th Cir. 2005) (superseded by statute on other grounds). The Seventh Circuit requires strict adherence to the exhaustion requirements. *Hernandez*, 814 F.3d at 842 ("Federal courts strictly enforce this requirement, and a prisoner fulfills this duty by adhering to 'the specific procedures and deadlines established by the prison's policy.'") (quoting *King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015)).

### A. Grievance Submitted on January 22, 2018

Daval's January 22, 2018 grievance complained that despite urgent referrals to see an ophthalmologist, no such examination had happened. He specifically requested that he be scheduled to see such a specialist and noted that he was at risk of losing vision in his left eye. But other than explaining that the prison's eye doctor had urgently referred him to the specialist, he did not say who he was complaining about. Dkt. 82-3, Ex. B, at 14. Despite the grievance not naming names, the assigned grievance counselor spoke with the Health Care Administrator and the Writ Officer. Based on those conversations, the counselor noted that Daval had "been seen multiple times for this issue and is being treated." *Id.* She made that

---

[4] Though the process itself is not important for this analysis, inmates incarcerated in an Illinois Department of Corrections facility generally submit written grievances to their Grievance Counselor within sixty days of the incident. 20 Ill. Admin. Code § 504.810(a). A Grievance Officer then considers the grievance and reports his or her findings to the Chief Administrative Officer (CAO). § 504.830(e). The CAO then reviews the report and advises the inmate of the decision in writing. *Id.* The CAO in this case was Warden Varga. § 504.802 (defining Chief Administrative Officer as "the highest ranking official in the correctional facility"). The inmate may then appeal to the Administrative Review Board within thirty days of receiving the decision. § 504.850(a).

note on March 23, 2018. *Id.* As explained further in the report to Daval, he had been sent to the specialists at HREI multiple times after filing the grievance. *Id.* at 15. Thus, the Administrative Review Board deemed the grievance moot. *Id.* at 16.

When a prisoner files a grievance, that prisoner must include "factual details," including "the name of each person who is the subject of or who is otherwise involved in the complaint." 20 Ill. Admin. Code § 504.810(c). But that does not mean that prisoners are required to know who is allegedly at fault. "This provision does not preclude an offender from filing a grievance when the names of individuals are not known, but the offender must include as much descriptive information about the individual as possible." *Id.* Other than that sentence, the IDOC grievance process is silent regarding what happens when the inmate is not necessarily complaining about a specific person or when the inmate has no idea who is responsible for the problem.

Defendants argue that Daval failed to exhaust his available administrative remedies because he did not name them in his grievance. Dkt. 71, at 5; Dkt. 78, at 3. Daval responds that he did not know who was responsible for the delays, and therefore, had no way to name them or describe them. Dkt. 81, at 9. He further asserts that his grievance did not confuse the Defendants; that they knew who he was talking about because they consulted with the individuals allegedly responsible for the delay. Furthermore, he argues that "prison officials can infer that a grievance complaining about inadequate medical care implicates Wexford." *Id.* at 10.

In *Maddox v. Love*, the inmate likewise did not indicate on the grievance form the identities of those responsible for the purported constitutional violation or attempt to describe them. 655 F.3d 709, 713 (7th Cir. 2011). The Seventh Circuit explained that "[w]here prison officials address an inmate's grievance on the merits without rejecting it on procedural grounds, the grievance has served its function of alerting the state and inviting corrective action, and defendants cannot rely on the failure to exhaust defense." *Id.* at 722. In making this determination, the court noted that "Maddox's compliance with the grievance process was never in question" and that, at every stage, his "grievance was rejected on the merits . . . without any indication from prison officials that it was procedurally deficient." *Id.* at 721. Relying on *Conyers v. Abitz*, 416 F.3d 580, 585 (7th Cir. 2005), the court explained that such procedural shortcomings are not failures to exhaust unless the prison officials rely on those shortcomings. *Id.* at 722.

In *Thornton v. Snyder*, Thornton argued that he had exhausted his administrative remedies because he had "received exactly what he had requested." 428 F.3d 690, 694–95 (7th Cir. 2005) (superseded by statute on other grounds). For example, under "relief requested" on an emergency grievance, he had asked to be transferred to a different cell because of the horrible condition of his current cell. *Id.* at 695. Although his grievance was deemed nonemergent, he was transferred out of that cell. *Id.* at 692, 695. In another grievance, Thornton requested a clean mattress. He then received a clean mattress and his grievance was deemed moot. *Id.* at 695. Still, the defendants in that case argued that he had not exhausted his

administrative remedies. The court in *Thornton* rejected this contention: "In short, the defendants' notion that Thornton should have appealed to higher channels after receiving the relief he requested in his grievances is not only counterintuitive, but it is not required by the PLRA." *Id.* at 697.

Here, Daval exhausted his administrative remedies for any claim related to his January 22, 2018 grievance. First, Daval was not aware who was responsible for the delays in him being sent to the eye specialist. Dkt. 90, ¶ 7. Although he presumably knew the identity of his prison eye doctor and the Warden, he cannot be expected to know the identities of those officials actually responsible for the logistics of scheduling and transporting him to any outside medical provider. "[I]t would be unreasonable to expect that, for every set of facts, an inmate will be able to peel back layers of bureaucracy and match a disputed decision with the prison employee responsible for that decision." *Glick v. Walker*, 385 F. App'x 579, 582 (7th Cir. 2010). Second, and more importantly, no prison official ever told Daval that he needed to provide more detail, nor did they need him to provide more detail. Dkt. 90, ¶ 8. Just as in *Maddox*, the prison officials here addressed Daval's grievance without the need for further information. They knew who to speak with, they did speak with those individuals, and then used the information gained from speaking with those individuals to respond—here, by noting that the issue had already been resolved. Dkt. 82-3, Ex. B, at 14. Third, the January 22, 2018 grievance was mooted—as was noted on the grievance form and response—because Daval was finally sent to the eye specialist. The grievance response listed those dates and explained that the

grievance was now moot. *Id.* As the Seventh Circuit explained in *Thornton*, because Daval had received the relief requested and the grievance had been mooted, he had exhausted his administrative remedies without the need to do anything else.

In their motion for summary judgment, the Wexford Defendants (Wexford, Dr. Zahtz, Cathy Smith, and Kay Hood) argue that they were not on notice of Daval's grievance because of his failure to name any of them. Dkt. 71, at 7. Essentially, they appear to be trying to differentiate between exhaustion as to the IDOC Defendants and exhaustion as to the Wexford Defendants. They cite multiple cases in support, but none are persuasive in light of the above Seventh Circuit precedent. First, they cite *Palmer v. Fengolio*, No. 10-cv-0718, 2012 U.S. Dist. LEXIS, 59249 (S.D. Ill. April 27, 2012). But there, the grievance did not alert the prison that Palmer wanted medical treatment. *Id.* at *12. Here, Daval's grievance specifically discussed the delays in getting the medical treatment that had been recommended, and Wexford provides IDOC inmates' medical treatment.[5] The Wexford Defendants also cite to *Woods v. Schmeltz*, No. 13-cv-1477, 2014 U.S. Dist. LEXIS 95068 (C.D. Ill. July 14, 2014). But that case's discussion and distinguishing of *Maddox* supports Daval's position. Like *Maddox* and unlike *Woods*, prison

---

[5] Unlike when the grievance fails to include any indication that the defendant is the target of the complaint, grievances that complain of medical failures clearly invoke Wexford and its employees, who are charged with providing medical care to Illinois inmates. Furthermore, the nature of the cited grievance paperwork cannot be misunderstood. The paperwork includes a checkbox option to indicate that the grievance is about the inmate's medical treatment. *See Roberts v. Neal*, 745 F.3d 232, 235–36 (7th Cir. 2014) ("[A] grievant is not required to know the name of the prison employee whom he's complaining about— often he will not know the employee's name—and so it is enough if he 'include[s] as much descriptive information about the individual as possible.'") (quoting 20 Ill. Admin. Code § 504.810(b)).

officials never told Daval that his grievance was procedurally defective and the grievance paperwork in the record (Dkt. 82-3, Ex. B, at 14) does not specifically request the names of each party involved. Thus, this Court follows *Maddox* for the same reason that the *Woods* court distinguished it.[6]

### B. Grievance Submitted on February 12, 2019

On February 5, 2019, Daval's ophthalmologist informed him that he would need urgent eye surgery within the week. On February 12, 2019, after that urgent surgery did not happen, Daval filed another grievance. This time, he checked the box indicating that the grievance was an emergency. Dkt. 82-3, Ex. B, at 17. Under relief requested, he explained that he needed to be sent out for surgery, as recommended, as soon as possible so that he would not lose vision in his eye. *Id.* On February 15, 2019, Warden Varga denied that request by checking the box indicating his belief that Daval had not substantiated the need to handle the grievance as an emergency. *Id.* That same day, a UIC specialist reiterated that Daval needed the surgery right away to avoid irreparable vision loss. Dkt. 90, ¶ 24. Three days later, Daval received the surgery. *Id.* The IDOC Defendants point out

---

[6] The Wexford Defendants also cite to *Smith v. Gale*, No. 10-cv-721, 2012 U.S. Dist. LEXIS 59908 (S.D. Ill. April 12, 2012). But that case is a report and recommendation from a magistrate judge in another district, and the Wexford Defendants have provided no indication regarding whether it was rejected or accepted by the district judge. Nevertheless, that case is different than both this case and *Maddox* for the same reason as *Woods*. There, the grievance was not enough because it did not mention the defendants, describe them, *and did not include any allegations of retaliatory behavior. Id.* at \*4. Thus, the grievance was not sufficient to exhaust the retaliation claim against the unnamed and undescribed defendants. *Id.* That would be analogous to this case if Daval failed to include medical complaints in his grievance.

that, after Warden Varga denied the grievance, Daval did not resubmit the grievance through the normal process. Dkt. 71, at 8.

Defendants argue that Daval did not exhaust his administrative remedies related to the February 22, 2019 grievances because it also did not name names and because he failed to resubmit that grievance through the normal process after Warden Varga denied it as nonemergent. *Id.* at 8–9; Dkt. 78, at 6–7 (the IDOC Defendants rested their argument only on Daval's failure to resubmit the grievance through the nonemergency process).

For any claim related to the February 12, 2019 grievance, Daval exhausted his administrative remedies. None of the Defendants addressed the Seventh Circuit's decisions in *Maddox* and *Thornton* in their opening briefs, or the fact that the grievance had been mooted by the February 18, 2019 surgery. The closest they came is a citation to *Dole v. Chandler*, 438 F.3d 804, 808 (7th Cir. 2006), for the proposition that exhaustion is required even when the prisoner requested relief that the Administrative Review Board has no power to grant. Dkt. 78, at 5. But even assuming Defendants intend to argue that a moot grievance must still be appealed, *Dole* does not support that assertion. First, *Maddox* is the more recent precedent. Second, in *Dole*, the Seventh Circuit merely pointed out that inmates must exhaust administrative remedies even when they request a relief that cannot be granted, "such as monetary damages." *Dole*, 438 F.3d at 809. In further explaining the point, the *Dole* court noted that "so long as the administrative authority has the ability to take *some* action in response to the complaint (even if not the requested action), an

14

administrative remedy is still 'available' under the PLRA." *Id.* (quoting *Booth v. Churner*, 532 U.S. 731, 742 (2001)). Thus, *Dole* did not hold that moot grievances (when a remedy has already been supplied) must be appealed. It held that a prisoner cannot request an unavailable remedy and then claim that the process has been exhausted even though other remedies are available.

In reply, the IDOC Defendants attempt to distinguish *Thornton*, but only as to the February 12, 2019 grievance. Dkt. 87, at 5–6. First, they attempt to differentiate between being moved to a different cell as requested and receiving the surgery as requested by pointing out that Daval would have needed post-surgical care. *Id.* at 6. But that argument is not persuasive. Daval cannot be expected to know in advance that he will be treated poorly after surgery, or that surgery will fail to fix the problem. At bottom, he filed the grievance because the Defendants were not affording him the urgent surgery he needed. After Daval was sent for surgery, the grievance was mooted. Second, the IDOC Defendants point out that *Thornton* was superseded by statute. Dkt. 78, at 6. Although that is true, it remains good law for other aspects of the opinion. That opinion pointed out that, at the time, the grievance process did not require inmates to resubmit the grievance through the nonemergency process after the Warden decided that the grievance did not warrant emergency treatment. *Thornton*, 428 F.3d at 694 ("There is nothing in the current regulatory text, however, that requires an inmate to file a new grievance after learning only that it will not be considered on an emergency basis."). That is what changed in the process. Now, inmates must resubmit the grievance. 20 Ill. Admin.

Code § 504.840(c). But that does not change the primary point that moot grievances are exhausted. Just as in *Thornton*, the IDOC Defendants' argument is counterintuitive.

Therefore, the same reasons that Daval exhausted his administrative remedies related to the January 22, 2018 grievance apply to the February 12, 2019 grievance, which was mooted when he received the surgery on February 18, 2019. Furthermore, the Defendants offer no persuasive arguments why this Court should deviate from *Maddox* and *Thornton*.

## C. Grievances Submitted on April 3 and 14, 2019

After his surgery, Daval continued to experience eye problems. He submitted an additional grievance on April 3, 2019. Dkt. 82-3, Ex. B, at 18. In the April 3, 2019 grievance, Daval explained that he had not been sent back within the three- to four-week timeframe that his specialist recommended at the last visit. He further explained that he continued to have issues with the eye. *Id.* at 19. On April 19, 2019, the Grievance Counselor approved the request and noted that UIC had cancelled the appointment Daval was supposed to attend and that she was waiting for a return call from UIC to reschedule. *Id.* The response to Daval on October 17, 2019 indicated that the grievance was denied as "appropriately addressed by the facility Administration." *Id.* at 22. Still, the Grievance Counselor had apparently already approved the request and took steps to rectify the problem by calling UIC to reschedule the missed appointment.

The only argument that the IDOC Defendants offer in support of their motion for summary judgment in relation to the April 3, 2019 grievance is that it again fails to name names. Dkt. 78, at 5. The Wexford Defendants include the same argument but add an argument that the grievance fails to complain of any policy or practice such that a *Monell* claim would be exhausted (more on that later). Dkt. 71, at 9. The Wexford Defendants also argue that Daval failed to exhaust his administrative remedies because the entire process lasted until well after the filing of this suit, though they do not address the apparent approval of his grievance on April 19, 2019. Dkt. 71, at 10–12.

Daval's response focuses on the slowness in the Defendants' response to the April grievances (filed on April 3 and 14). First, none of the Defendants ever moved for summary judgment regarding the April 14, 2019 grievance in their opening briefs, so this argument is forfeited. *Campos v. Cook Cty.*, 932 F.3d 972, 976 n.2 (7th Cir. 2019). The Wexford Defendants did, however, mention the April 14, 2019 grievance in their reply brief, once prompted by Daval's response. Dkt. 85, at 5. Still, the April 14, 2019 grievance does not add anything to the already exhausted grievances. Although it does ask that staff members be suspended, it complains about the same continued problems with delays. Dkt. 82-3, Ex. B, at 23.

Second, the Court sees no reason to contemplate the speed of the response to the April 3, 2019 grievance when the grievance was approved sixteen days after it was filed. The Grievance Counselor noted the failure, stated that the grievance was approved, and took affirmative steps to correct the error. Dkt. 82-3, Ex. B, at 18–20.

That approval exhausted Daval's administrative remedies for the same reason that a moot grievance exhausts an inmate's administrative remedies. *See Thornton v. Snyder*, 428 F.3d 690, 697 (7th Cir. 2005). Because Defendants have not addressed this clear issue, they have not met their burden to show they are entitled to judgment as a matter of law.

### D.  *Monell* Claim

The Wexford Defendants argue that Daval did not exhaust his remedies as it relates to his *Monell* claim. Dkt. 71, at 4, 7–8, 10. They claim this fails to meet the requirements set forth in 20 Ill. Admin. Code. § 504.810(c). In support, the Wexford Defendants cite to *Nally v. Obaisi*, No. 17-cv-2902, 2019 U.S. Dist. LEXIS 208708, at *7–9 (N.D. Ill. Dec. 4, 2019). But that case does not support Wexford's argument. Indeed, the words "*Monell*", "custom", and "practice" do not even appear in that decision.  And the word "policy" in that opinion is untethered to any *Monell* claim. Furthermore, Daval in response cites to *Conley v. Birch*, No. 11-cv-0013, 2012 U.S. Dist. LEXIS 133564 (S.D. Ill. Sept. 19, 2012). There, a district court in this circuit determined that, even though the grievance failed to mention Wexford and did not identify any policy or practice, the need to alert the prison to the wrongdoing was satisfied by the plaintiff's grievances. *Id.* at 12–13. The plaintiff had submitted multiple grievances and supplied details alerting it to the problems with scheduling medical treatment. *Id.* at 13. In making that determination, the court explained that "Conley was not required to identify specific Wexford policies or grieve specific Wexford practices." *Id.* Still, neither case binds this Court. *Gould v. Bowyer*, 11 F.3d

82, 84 (7th Cir. 1993). To the extent that any nonbinding decision holds that inmates must specifically grieve a custom, policy, or practice against Wexford to exhaust their administrative remedies so that they can later plead a *Monell* claim, the Court declines to follow them. Indeed, *Conley* is persuasive in this regard.

Although the Court knows of no binding precedential authority on the question of whether plaintiffs pleading *Monell* claims must have filed grievances specifically complaining of policies or widespread practices, several reasons counsel against Wexford's argument. Primarily, there is the language of the regulation. The Seventh Circuit has clearly instructed its district courts to enforce the grievance requirements strictly. That strict enforcement would seemingly go both ways; the Court holds both plaintiffs and prison officials to the text of the codified grievance process. *See Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016) (requiring strict enforcement).

But nothing in the text of IDOC grievance process instructs inmates to complain about specific policies or practices. Indeed, the grievance procedures do not even contemplate *Monell* claims. *See* 20 Ill. Admin. Code 504.800 *et seq*. Nothing in the Illinois Department of Corrections regulations require an inmate to meet a *Monell* pleading standard—and with good reason. Inmates will know what happened to them. It would be unreasonable for an inmate to know—and then basically plead—a policy, custom, or practice by Wexford.  Furthermore, in referring to "the incident, occurrence or problem," the grievance process seemingly applies to individual complaints of an inmate, instead of a widespread custom or practice that

19

affects more than just that inmate (as contemplated by claims under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). § 504.810(a). Lastly, the grievance process is further focused on complaints against individual persons rather than widespread customs or practices against a corporation precisely because it asks for "the name of each person" involved or "as much descriptive information about the individual as possible." § 504.810(c). Thus, the text of the IDOC grievance process does not require inmates to list any specific widespread practices or customs on the grievance form. If Illinois policymakers expect state inmates to do more, then creating those procedures is up to them, not the courts. "Whatever temptations the statesmanship of policy-making might wisely suggest, the judge's job is to construe the statute—not to make it better." *Jones v. Bock*, 549 U.S. 199, 216 (2007) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 533 (1947)).

### III. Motion to Dismiss

Warden Varga moves to dismiss him from this suit under Rule 12(b)(6) for failure to allege his personal involvement in the alleged constitutional violation.[7] Dkt. 74. In response, Daval points to Warden Varga's personal involvement in the grievance process. Dkt. 83, at 2. Specifically, he notes the delay in his eye surgery due to Warden Varga's decision to deny his emergency grievance of February 12, 2019. *Id.* Furthermore, Daval asserts that Warden Varga knew that Daval was not receiving the urgent treatment he needed and that the Warden did nothing about it.

---

[7] Although Warden Varga makes multiple arguments, the Court need only address his personal involvement in the purported constitutional violation.

20

As Daval sees it, that is enough to state a claim for deliberate indifference to a serious medical need. *Id.* at 5.

To defeat a motion to dismiss, the plaintiff must have alleged facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This means that a plaintiff's well-pleaded factual allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 622, 678 (2009). The Court accepts as true all of the plaintiff's well-pleaded allegations and views them in the light most favorable to the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019).

In any individual capacity claim of a constitutional violation under 42 U.S.C. § 1983, the plaintiff must allege how each defendant was personally involved in the purported violation. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("Each defendant is entitled to know what he or she did that is asserted to be wrongful. A complaint based on a theory of collective responsibility must be dismissed. That is true even for allegations of conspiracy."); *Minix v. Canarecci*, 597 F.3d. 824, 833 (7th Cir. 2010) (discussing the personal involvement requirement).

Daval's allegations specific to Warden Varga focus on his involvement in the grievance process. As Warden and Chief Administrative Officer at DCC, Warden Varga handled emergency requests. On February 15, 2019, he denied Daval's emergency grievance that requested Daval be sent out for eye surgery. In denying the grievance, Warden Varga concluded that Daval had not substantiated the need

to treat the problem as an emergency. Dkt. 57, ¶¶ 11, 42. As alleged, Daval received that surgery on February 18, 2019, notwithstanding Warden Varga's denial. *Id.* ¶ 44. Daval's complaint alleges no further personal involvement by Warden Varga. In effect, Daval argues that the grievance process put Warden Varga on notice of the delays in Daval's treatment. The failure to do anything about that problem once on notice, Daval argues, is enough to state the Warden's personal involvement in the alleged constitutional injury. Dkt. 83, at 6.

In *Gevas v. Mitchell*, the Seventh Circuit explained being involved in the grievance process alone is insufficient to establish personal involvement: "Gevas alleges no personal involvement outside of the grievance process, and for that reason his third amended complaint, just like the previous iterations, fails to state a claim against the warden." 492 F. App'x 654, 660 (7th Cir. 2012). In *Owens v. Godinez*, the Seventh Circuit explained again that the mishandling of "grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim." 860 F.3d 434, 438 (7th Cir. 2017) (quoting *Owens v. Hinsley*, 635 F.3d 950, 953–54 (7th Cir. 2011)). Therefore, because Daval has alleged no personal involvement by Warden Varga outside the grievance process, the Warden's motion to dismiss for failure to state a claim must be granted. Warden Varga is dismissed without prejudice.

## IV. Conclusion

For the reasons explained above, the motions for summary judgment [70,77] are denied, but the motion to dismiss Defendant John Varga [74] is granted. The

dismissal, however, is without prejudice to amend the complaint and allege Varga's personal involvement in the alleged constitutional violation. If Daval declines to amend by June 11, 2021, the Court's dismissal of Defendant John Varga will be with prejudice.

Date: May 24, 2021

Honorable Iain D. Johnston
United States District Judge
Northern District of Illinois
Western Division