## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| Paul Daval, | |
| Plaintiff, | Case No. 3:19-cv-50147 |
| v. | Honorable Iain D. Johnston |
| Dr. Merrill Zahtz, John Varga, Wexford Health Sources Inc., Cathy Smith, Kay Hood, and Amber Allen, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Paul Daval ("Daval"),[1] who is incarcerated at Dixon Correctional Center (DCC), brings this suit under 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment right to be free of cruel and unusual punishment. His claims center around continuous delays in his medical treatment, specifically with the scheduling of necessary visits to eye specialists to treat his sarcoidosis.

Daval reached a settlement agreement with nearly all the defendants, except for Defendant Amber Allen ("Allen"). Allen now moves for summary judgment. For the reasons explained below, Allen's motion for summary judgment is granted.

---

[1] Daval is represented by Alec Solotorovsky, Jordan V. Hill, and Margaret G. Houseknecht. The Court thanks them for their representation of Daval in this action. The Court notes that this is not attorney Solotorovsky's first case in which he has acted as *pro bono* counsel. His efforts in this regard are not unnoticed, but, instead, are greatly appreciated.

## I.   Legal Standard

### A.  Summary Judgment

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). However, "[s]peculation is insufficient to withstand summary judgment." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996). Indeed, "the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B.  Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts

presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("Factual allegations not properly supported by citation to the record are nullities.").

## II.   Background[2]

Allen was the Health Care Unit Administrator ("HCUA") at Dixon Correctional Center ("DCC"). *See* Dkt. 139 ¶ 4. She worked in a lateral role to the medical director, and she was responsible for overseeing the Health Care Unit at DCC and other correctional centers to ensure that individuals in custody had access to healthcare. Dkt. 141 ¶¶ 4, 7-8. She did not personally provide medical care or schedule appointments for individuals, but she sometimes intervened if there were issues with scheduling appointments. Dkt. 139 ¶¶ 4-5; Dkt. 141 ¶¶ 5-6. As part of her duties, Allen also reviewed individuals' medical records when responding to grievances regarding medical treatment or a request for a referral. Dkt. 139 ¶ 9; Dkt. 141 ¶ 9. After reviewing an individual's medical records, she would provide a written response on a specific form to the correctional counselor. Dkt. 139 ¶ 10. Allen was familiar with Daval and his situation from reviewing his medical chart, but also from receiving phone calls from Daval's mother. Dkt. 143 ¶ 19.[3]

---

[2] The facts are drawn from Allen's statement of facts, Dkt. 139; Daval's response to Allen's statement of facts, Dkt. 141; Daval's statement of additional facts, Dkt. 143; and Allen's response to Daval's statement of facts, Dkt. 149.

[3] The parties dispute when the phone calls from Daval's mother began. Dkt. 153 ¶ 20; Dkt. 149 ¶ 20.

Daval suffers from sarcoidosis, which in his case causes inflammation in his left eye. Dkt. 143 ¶ 1; Dkt. 149 ¶ 1. Prolonged periods of elevated pressure can damage the optic nerve and cause a loss of peripheral vision. Dkt. 143 ¶ 3; Dkt. 149 ¶ 3.

When Daval arrived at DCC in 2017, he received prescription eye drops for the inflammation. Dkt. 143 ¶ 2; Dkt. 149 ¶ 2. On November 7, 2017, Daval saw an optometrist at DCC, who made an urgent referral for Daval to see an ophthalmologist. Dkt. 143 ¶¶ 4, 6; Dkt. 149 ¶ 4. During that visit, Daval's intraocular pressure ("IOP")[4] for his left eye was measured to be 40 mmHg. Dkt. 143 ¶ 4.[5] Over the next couple months, Daval's IOP was measured three more times, yielding 26, 38, and 27 mmHg. Dkt. 143 ¶ 8. The normal range for IOP is 10-23 mmHg. *Id.* ¶ 5.

---

[4] "Intraocular pressure" is the fluid pressure inside the eye and measured in millimeters of mercury (mmHg). *Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 982 (N.D. Ill. 2012).

[5] Allen's counsel objects to all asserted facts that contain an IOP measurement on the basis that she is not an optometrist and therefore cannot admit or deny whether a medical record states that Daval's IOP was the asserted measurement. *E.g.*, Dkt. 149 ¶ 4. This objection is meritless on multiple levels, including these two. The first being that if the state of Illinois is too stingy or lazy to investigate a fact, that's its own choice, which should not prejudice Daval. A party can't seek summary judgment by ignoring unhelpful facts. Second, there's no medical or scientific opinion being offered—and an opinion witness is not needed for factual testimony. *See* Fed. R. Evid. 701 (limiting only opinion testimony). Indeed, other courts in this circuit have considered IOP measurements gleaned from medical records at summary judgment. *See, e.g.*, *Williams v. Duncan*, No. 17-CV-376, 2020 U.S. Dist. LEXIS 78679, at *2 n.1 (S.D. Ill. May 5, 2020); *Watts v. Kidman*, No. 18-cv-49, 2020 U.S. Dist. LEXIS 184988, at *5 (W.D. Wis. Oct. 5, 2020); *cf., e.g.*, *McCaskill v. Manila*, No. 13 C 3166, 2014 U.S. Dist. LEXIS 179186, at *2 (N.D. Ill. Dec. 30, 2014) (reciting a fact about the plaintiff's blood pressure as measured in mmHg).

Daval had yet to see an ophthalmologist two and a half months after the referral, so he filed a grievance on January 22, 2018 (the "January 2018 grievance"). Dkt. 139 ¶ 11. In it, he wrote that:

> (1) he had been "diagnose[d] with a c[h]ronic disease in [his] left eye," (2) he was "having vision problems for over 4 months," (3) "the eye doctor [] at Dixon" "refer[red Mr. Daval] to see an eye specialist and that it was 'Urgent,'" (4) "this was in early November of 2017 and it's now January of 2018 and [he had yet to see] a specialist," and (5) he requested to "see a[n] eye specialist, [because] the doctor said that it is urgent and that [he] could lose [his] vision in [his] left eye if not treated."

Dkt. 143 ¶ 16 (alterations in original).

Before receiving any response on the grievance, Daval had his first visit to the ophthalmologist at the Hauser-Ross Eye Institute (HREI) on March 1, 2018. *Id.* ¶¶ 7, 9. He was seen again at HREI on March 9, 2018. *Id.* ¶ 9.

March 2018 was also "around the time" Allen first learned about Daval's eye condition. *Id.* ¶ 18. She responded to the grievance during this time; based in part on her response, Daval's correctional counselor responded to the January 2018 grievance on March 23, 2018, with the written note:

> Per Health Care Administrator & writ officer this inmate has been seen multiple times for this issue band [sic] is being treated.

*Id.* ¶ 17; Dkt. 139 ¶ 12. The grievance then went to the DCC grievance officer, who received it on April 4, 2018. Dkt. 139 ¶ 13.

Daval saw an HREI ophthalmologist one more time—on April 5—before the DCC grievance officer responded to the January 2018 grievance. *Id.* ¶ 14; Dkt. 143 ¶ 9. The grievance officer's response on May 11, 2018, acknowledged the then three HREI appointments that Daval had as well as an upcoming one:

> Per Health Care, Inmate Daval has been seen and treated numerous times. Movement records indicate that Offender Daval has seen eye specialists at Hauser Ross on 3-1-18, 3-9-18, 4-5-18 and has another appointment this month.

Dkt. 139 ¶ 14.

From March to September 2018, Daval saw an ophthalmologist at HREI on a regular basis. *See* Dkt. 143 ¶ 9. In addition to the appointment on April 5, Daval had four more appointments. *See id.* After the last one on September 21, 2018, the ophthalmologist ordered a follow-up visit in 2-4 weeks or as needed. *Id.* ¶ 10; Dkt. 149 ¶ 10. Through the rest of 2018, Daval did not have any appointments at HREI, but he did have some appointments with an eye doctor at DCC. Dkt. 143 ¶ 11; Dkt. 149 ¶ 11.

On January 11, 2019, Daval was seen at HREI, and his IOP was measured to be 43 mmHg. Dkt. 143 ¶ 11. Less than a month later, on February 1, his IOP had risen to 53 mmHg, and the ophthalmologist prescribed "max[imum] medications" to see if Daval's IOP could be improved without surgery. *Id.* ¶ 12 (alteration in original). The increased dosage did not help, so four days later an ophthalmologist ordered that Daval undergo emergency surgery "within the week." *Id.* ¶ 13.

One week later, on February 12, Daval filed an emergency grievance requesting to be sent out for surgery as soon as possible, noting that the ophthalmologist recommended the University of Illinois at Chicago Medical Center ("UIC") or wherever he could be sent for immediate care. Dkt. 139 ¶ 15; Dkt 142-3 at DAVAL 00007. The grievance was deemed a non-emergency grievance, and

there's no indication that the grievance was forwarded to the Health Care Unit for review. Dkt. 139 ¶ 16.

About two weeks after the order for emergency surgery, on February 18, 2019, Daval underwent surgery at UIC. Dkt. 143 ¶ 14. Despite the surgery, Daval lost his peripheral vision in his left eye. *See id.* ¶ 15; Dkt. 149 ¶ 15; Dkt. 141 at 4; Dkt. 139-1 at 59:14-15.

On April 3, 2019, Daval filed a grievance requesting to see an eye doctor after having undergone surgery (the "April 2019 grievance"). Dkt. 139 ¶ 18. A correctional counselor received the grievance on April 19. *Id.* Daval filed another grievance on May 2, 2019, "requesting that it be noted that the Medical Director was negligent for failing to schedule an appointment for him and taking him off medication without consulting with his UIC doctor" (the "May 2019 grievance"). *Id.* ¶ 19.

Six days after the May 2019 grievance, Allen responded to the April 2019 grievance with a note that she had reviewed his medical chart and called UIC because it canceled his appointment without rescheduling. *Id.* ¶ 20. After another month and a half, on July 26, the correctional counselor then responded to the April 2019 grievance with an almost identical note, merely adding "Per HCUA Allen" to the beginning. *Id.* ¶ 21. Nearly two months later, the DCC grievance officer added a response that noted Allen's finding about the cancelation and that listed Daval as having gone to UIC on May 16, August 1, and August 29, 2019. *Id.* ¶ 22.

As for the May 2019 grievance, over five months passed before it received a response; on October 28, 2019, a correctional counselor responded with a note that Allen had contacted UIC about the appointment, that the scheduler had deemed it not urgent, and that Daval had been seen on May 16. *Id.* ¶ 23.

Sometime during the spring of 2019, Allen requested a meeting between Wexford and the Office of Health Service because there was an issue with the UIC employee who scheduled appointments for individuals from DCC. *Id.* ¶ 25; Dkt. 141 ¶ 25. Delays in getting appointments at UIC had been an ongoing issue, and there were regular complaints. Dkt. 141 ¶ 25. Allen requested the meeting with Wexford when she discovered that the cause of these delays was with the UIC scheduler. *Id.* This prompted "ongoing conversations" throughout the summer and fall that year. *Id.* However, it appears that the scheduling issue persisted, as on February 7, 2020, Allen wrote in an email:

> Paul Daval R68365 keeps getting cancelled and rescheduled by UIC because it seems like they do not have communication at UIC of who should be seeing him which further delays his care. He has litigation going on and a mother that calls all the time. I got involved and after some back and forth they put him back on for today, which screwed up manpower for the major as our writ office already advised he was cancelled and they had to start over again.

Dkt. 139 ¶ 24.

## III. Analysis

Title 42 U.S.C. § 1983 provides a cause of action against any person who, under color of a state's "statute, ordinance, regulation, custom, or usage" deprives any person of a right secured by the federal Constitution. 42 U.S.C. § 1983. Liability must be based on each defendant's knowledge and actions, *Kuhn v. Goodlow*, 678

F.3d 552, 556 (7th Cir. 2012), which may include either direct participation in the "offending act," acting or failing to act with reckless disregard of someone's constitutional rights when under a duty to safeguard them, or allowing an offending act to occur with one's knowledge or consent. *Childress v. Walker*, 787 F.3d 433, 439-40 (7th Cir. 2015).

The Eighth Amendment prohibits deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To make a claim of deliberate indifference, a plaintiff must show (1) an objectively serious medical need (2) to which the defendant was deliberately indifferent. *Farmer v. Brennan*, 511 U.S. 825, 834, 847 (1994); *see also Stockton v. Milwaukee County*, 44 F.4th 605, 614 (7th Cir. 2022). In addition, the plaintiff must show that the deliberate indifference injured the plaintiff. *Stockton*, 44 F.4th at 614.

The parties do not dispute that Daval had an objectively serious medical condition. *See* Dkt. 140 at 3; Dkt. 141 at 3 n.1. The remaining questions are whether Allen acted with deliberate indifference and whether this deliberate indifference caused harm to Daval.

"Deliberate indifference requires a look into the subjective state of the defendant['s] mind." *Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022). To have a "sufficiently culpable state of mind," the defendant must be subjectively aware of the specific, serious medical need or risk and must disregard it by "failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 834, 847; *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). The defendant must know of the facts

from which the risk is inferred, and the defendant must draw that inference. *Farmer*, 511 U.S. at 837. "Mere negligence or even civil objective recklessness simply is not enough." *Brown*, 38 F.4th at 550 (citing *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)) (cleaned up). Deliberate indifference is a demanding standard "because it requires a showing [of] something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

Deliberate indifference can be proven through direct or circumstantial evidence. *Brown*, 38 F.4th at 550. Circumstantial evidence that "can permit a jury to reasonably infer deliberate indifference" includes "denial of medical treatment altogether, delay of medical care," and "ignoring an obvious risk." *Id.* (citations omitted). When a claim of deliberate indifference is based on a delay in treatment, the plaintiff must show that the defendant's actions or inaction caused the delay. *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019). The plaintiff generally must also produce some "verifying medical evidence" that the delay (and not the underlying condition) "caused some degree of harm." *Jackson v. Pollion*, 733 F.3d 786, 790 (7th Cir. 2013); *Petties*, 836 F.3d at 730-31. But at the summary judgment stage, if there is evidence that would allow a jury to infer that a delay in treatment caused harm, that is enough to reach trial. *Gayton v. McCoy*, 593 F.3d 610, 625 (7th Cir. 2010).

Allen argues that she was "con[scien]tious, thorough, and caring" as the HCUA at DCC. Dkt. 140 at 4. Daval argues that this is not supported by undisputed

evidence and that Allen "took little to no action" despite knowing about his condition and the delays in treatment. Dkt. 141 at 10. He characterizes this as failing to "accelerate" his medical treatment, despite being aware of his condition and the delays in his treatment. *Id.* at 8. Although Allen is right that Daval's cited cases don't also use the word "accelerate," her reply brief's focus on the word "accelerate" sometimes misses the forest for the trees. From the context of the situation painted by Daval, if Allen had prevented the delays in treatment, that would have "accelerated" the slow treatment that Daval received to a pace that Daval argues he should have experienced. And delays can allow an inference of deliberate indifference. *Brown*, 38 F.4th at 550.

The factual record shows that Allen was involved in the responses to Daval's January 2018, April 2019, and May 2019 grievances;[6] in calling UIC to try to schedule an appointment in 2019; and in working to address the broader issues of delayed referrals to UIC. In Daval's response brief, he identifies three ways that Allen's inaction led to the delay in treatment of Daval's sarcoidosis: contributing to the denial of Daval's January 2018 grievance, not investigating the delay described in that grievance, and not addressing the broader issue of delayed referrals to UIC. Dkt. 141 at 7.

---

[6] There is no evidence that the grievance filed on February 12, 2019, was forwarded to the Health Care Unit, Dkt. 139 ¶ 16, so there's no inference that Allen was involved in the response.

### A. Denial of the January 2018 grievance

Daval argues that Allen's response led to his January 2018 grievance being denied. *Id.* at 6. Allen wasn't aware of Daval's situation until sometime around March 2018, so she can't have been deliberately indifferent before then because she wouldn't have known there was a risk of serious harm. *See Farmer*, 511 U.S. at 847. The space-time continuum doesn't work that way. This is basic causation. It's unknown exactly when in March 2018 that Allen first learned of Daval's situation; it's possible that she would have seen Daval's March 1 appointment at HREI when reviewing his medical chart, in which case the grievance's request had already been fulfilled when Allen looked at it. But drawing inferences in favor of Daval, Allen's response that Daval had been seen multiple times may have referred only to his optometrist appointments at DCC.

Even if Allen did ignore Daval's need for an ophthalmologist appointment, there is no causal connection between that and Daval's peripheral vision loss. The Court does find that there is enough evidence in this case to infer that the delay in treatment caused a loss of peripheral vision for Daval. High pressure over a course of time can lead to loss of peripheral vision. Dkt. 143 ¶ 3; Dkt. 149 ¶ 3. (Perhaps this is why the Wexford defendants settled.) During the period of time that Daval spent trying to see an eye specialist and undergo surgery, his IOP was higher than the normal range. *See* Dkt. 143 ¶¶ 4-5, 8, 11-12. And Daval now has no peripheral vision in his left eye. Dkt. 141 at 4; Dkt. 139-1 at 59:14-15. That the pressure *over time* can lead to this loss of vision allows for the reasonable inference that a delay in treatment, increasing the length of time during which Daval suffered this high

pressure in his eye before his eye surgery, could have led to his loss of peripheral vision.

But by the time the correctional officer, relying on Allen's response, denied the grievance, Daval had gone to HREI twice. *See* Dkt. 139 ¶ 12; Dkt. 143 ¶¶ 9, 17. Likewise, the DCC grievance officer's response on May 11, 2018, which appears to reference Allen's finding ("Per Health Care"), noted the three HREI appointments that Daval had by then and an upcoming appointment that month. *See* Dkt. 139 ¶ 14. Even if Allen were responsible for the grievance being denied, as Daval argues, Dkt. 141 at 6, the denied grievance didn't create a delay in Daval getting an appointment. Nor did Allen's response—by the time she learned of Daval's situation, he already at least been scheduled for that first HREI appointment. This is unlike *Taylor v. Wexford Health Sources, Inc.*, which Daval cites, where the plaintiff never received any appointments for two years and the plaintiff's complaints were ignored. No. 14-cv-122, 2017 U.S. Dist. LEXIS 151245, at *19 (S.D. Ill. Sept. 18, 2017). Allen's response didn't create a delay in treatment, so it does not show deliberate indifference. *See Walker*, 940 F.3d at 964 (7th Cir. 2019).

## B. Investigation of delayed ophthalmologist appointments

Not only did Allen's response to the January 2018 grievance show deliberate indifference, Daval argues, but she also failed to investigate the cause of the delay described in that grievance. Dkt. 141 at 7. Allen admits that her job was to "identify and correct issues preventing or delaying access . . . to medical treatment," Dkt. 140 at 5, and she did investigate delays with the UIC scheduler. But there is no evidence that she did so when confronted with the delay that Daval described in his

January 2018 grievance. *See* Dkt. 141 at 10. Strangely, nor does her counsel address this lack of investigation in the reply brief.

However, there is no evidence that Allen knew about the further delays in Daval's treatment. The January 2018 grievance covered the delay from November 2017 to March 2018. Dkt. 143 ¶ 16. After that, Daval had "regular" appointments from March to September 2018. Dkt. 141 at 3. Daval alleges that his appointments "were again delayed for months" between September 2018 and January 2019, during which he saw only the optometrist at DCC instead of the ophthalmologist at HREI. Dkt. 141 at 4; Dkt. 149 ¶ 11. But Daval filed no grievances during this time. It's possible that Daval's mother called Allen during this period, but it requires speculation to infer how long before Daval's surgery that his mother started calling Allen. *See* Dkt. 143 ¶ 20; Dkt. 149 ¶ 20. And speculation is not enough to survive summary judgment. *Ortiz*, 94 F.3d at 1127.

Without evidence that Allen would have known about the subsequent delays, the lack of investigation following the January 2018 grievance isn't enough for a reasonable jury to infer that Allen had the subjective state of mind required for deliberate indifference. *See Farmer*, 511 U.S. at 847; *Johnson*, 433 F.3d at 1010. Even if Allen should have done more to address the concern raised by the January 2018 grievance, mere negligence isn't enough. *Brown*, 38 F.4th at 550.

### C. Delayed referrals to UIC

Both parties discuss Allen's actions in trying to remedy the delayed referrals to UIC. Daval argues that there's no evidence Allen took any steps to fix the problem before the spring of 2019, and that the only result was for some "ongoing

14

conversations" with Wexford later in 2019. Dkt. 141 at 7-8. Allen argues that she "helped identify and correct an issue" that delayed Daval's treatment, showing that she did not delay or deny Daval's access to treatment. Dkt. 150 at 7. Allen's February 2020 email indicates that she wasn't able to resolve the issue, but it does show that this was part of her responsibility in ensuring access to medical treatment and she was taking steps to address the problem. *See* Dkt. 140 at 6.

The first time in this case that Allen acted on this issue was in response to Daval's April 2019 grievance, when Allen called UIC upon discovering that it had canceled an appointment without rescheduling. Dkt. 139 ¶ 20. Later grievance responses indicate that Daval was able to get an appointment at UIC on May 16, 2019, nearly three months after his surgery. *See* Dkt. 139 ¶¶ 22-23. But Daval does not argue that the delay in his post-surgery appointments caused his vision loss. *See* Dkt. 141 at 8.[7]

There is no evidence that Allen intervened with the delay in scheduling Daval's eye surgery at UIC, which is the only time before the April 2019 grievance that the facts show Daval needing to go to UIC. She may not have known about Daval's emergency grievance when the surgery wasn't "within a week" like the doctor ordered, but Allen was aware that scheduling appointments with UIC had generally been a problem. Drawing reasonable inferences in favor of Daval, it appears that these delays had been occurring for years, but it wasn't until spring

---

[7] Daval argues that he suffered vision loss despite the surgery, and there are no allegations of high IOP measurements after the surgery, so Allen's actions after the surgery—including her responses to Daval's April and May 2019 grievances and her lack of resolution with the UIC scheduler issue—cannot have caused the harm that Daval alleges.

2019 that Allen discovered that the issue was caused by the UIC scheduler. Dkt. 141 ¶ 25. However, that is not enough to show that Allen was deliberately indifferent toward Daval because although she could have investigated the UIC scheduling delays in February 2019 (when Daval's surgery had been ordered), she needs to have known that there was a serious risk to Daval's health because of this scheduling issue to have a "sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834; *Johnson*, 433 F.3d at 1010.

## IV. Conclusion

Viewing the evidence in Daval's favor, the facts do not show that Allen acted with deliberate indifference toward the delays in medical treatment that Daval faced. The Court grants Allen's motion for summary judgment. This case is dismissed with prejudice.

Date: December 1, 2023

Honorable Iain D. Johnston
United States District Judge
Northern District of Illinois
Western Division